**IN THE COURT OF APPEALS OF IOWA**

No. 16-0557
Filed May 3, 2017

**IN RE THE MARRIAGE OF LORI A. LEO**
**AND MICHAEL A. LEO**

**Upon the Petition of**
**LORI A. LEO,**
        Petitioner-Appellee,

**And Concerning**
**MICHAEL A. LEO,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Buchanan County, John J.

Bauercamper, Judge.


        Michael Leo appeals various economic provisions of the decree dissolving

his marriage to Lori Leo.  **AFFIRMED.**




        Jill A. Dillon of Dillon Law, P.C., Sumner, for appellant.

        Gary J. Boveia of Boveia Law Firm, Waverly, for appellee.


        Considered by Tabor, P.J., Mullins, J., and Goodhue, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**MULLINS, Judge.**

Michael Leo appeals various economic provisions of the decree dissolving his marriage to Lori Leo. We affirm.

## I. Background Facts and Proceedings

Michael and Lori were married in Oelwein, Iowa, in February 1982, when neither party had any assets of note.[1] Shortly thereafter, they moved to Austin, Texas. During that time, Lori attended college, worked part time and bore the parties' first child. After graduating in 1985 with a bachelor of science degree in education, Lori worked in Texas as a middle school teacher. Michael has not received any postsecondary education. Instead, while in Texas, Michael was employed in various jobs: as an electrician's assistance, as an employee and part-owner of a construction business, and as an owner of a pizza business. All of Michael's business ventures, which had been funded by loans from Mike's and Lori's relatives, were unsuccessful. Eventually, their respective family members forgave the loans.

In 1988, Mike moved back to Iowa to work in his father's business and open his own pizza place. At that time, Lori's job in Texas provided the family's health insurance and financial support, so she joined Mike in Iowa later that year after the second child was born and she had completed teaching the school year. Through the end of 1988, the parties worked on opening the pizza business, which launched in January 1989. Lori continued to work at their new business until the fall of 1989. At that time, Lori resumed teaching and she has continued

---

[1] They both graduated high school in Oelwein, Iowa. Prior to their marriage, Lori completed three years of postsecondary education at two different universities.

to teach through the date of trial. Lori has been very successful in her field and has received a number of honors and recognitions for her work, one of which included an annual financial award.[2] While teaching, Lori worked less at the restaurant but helped as a hostess on the weekends when needed.

While running the pizza business, Michael also made and sold food products including Italian sausage and bread. However, Michael's business became competition for his father's business, so Michael closed his business and went to work with his father. When that arrangement ended, Michael formed Leo Foods, Inc., through which Michael sells bread bowls, and opened Leo's Italian Restaurant. Michael also spent a couple of years working as a food broker. In 2007 to 2008, Michael expanded Leo's Italian Restaurant, adding Generation's Lounge. Michael financed this expansion by mortgaging the parties' residence as security for the loan; Lori also signed this mortgage. The district court found Lori had worked in the restaurant and lounge on a very limited, as needed basis. Throughout the couple's time in Oelwein, both parties were active in the community, which garnered goodwill for Michael's businesses.

In the decree, the district court noted Michael received substantial inheritances from his uncle and aunt, some of Michael's relatives filed suit against him during the administration of the uncle's estate, and the litigation was

---

[2] Lori was employed for eleven years as a special education teacher at West High School in Waterloo, Iowa. While there, she became the director of special education and supervised other teachers and teaching associates. In 2000, she took a position in Oelwein, Iowa, in order to shorten her commute and have more time for the parties' children. Over the years, she taught special education and sixth grade. In addition to the honor of being promoted to department supervisor in Waterloo, Lori was selected as the Oelwein Middle School Teacher of the Year for the 2013 to 2014 school year and was designated as an Iowa Model Teacher, for which she receives an annual financial award. She has also earned a master's degree from the University of Northern Iowa.

resolved by a settlement agreement. The first issue Michael raises on appeal is an argument the district court's treatment of gifts and inheritances was inequitable. Thus, the parties' briefs discuss at length their respective views of their involvement with Michael's uncle and aunt and of the money received.

The parties generally agree that, from early on in their marriage, both Lori and Michael would, along with their children, visit Michael's aunt and uncle and Michael would occasionally make additional visits on his own. At some point when the parties were living in Oelwein, it became clear to Michael that his aunt and uncle should no longer be living by themselves without assistance, so the aunt and uncle were relocated to Michael's father's empty home, near to Lori and Michael. Lori contends she spent considerable time preparing the home for the aunt and uncle's arrival and, after they moved in during the summer, went daily to help them shower, dress, and attend to their daily needs. Michael contends these were joint efforts. Lori further states that, after she returned to teaching in the fall, she continued to pick up their groceries and medications and help them pay their bills. Ultimately, others were hired to help provide care. The parties state the aunt and uncle continued to come to Michael and Lori's home for weekly dinners as well as for holidays and special events. Eventually, the aunt and uncle entered a nursing home. Lori claims she and Michael continued to visit them, purchase clothes and other items for them, and host them.

Michael asserts that during their time in Oelwein his aunt and uncle gifted him approximately $400,000. Lori claims she and Michael approached the aunt and uncle and asked for financial help in purchasing their home. She further claims the aunt and uncle provided the requested help and then continued to

provide financial gifts to both Michael and her. In 2005, Michael's uncle passed away. Ultimately, after some litigation, the uncle's estate was left to the aunt. Michael's aunt passed away in 2008. Michael reports he inherited approximately $103,000 from his aunt and uncle after expenses were paid. At the time of trial, approximately $42,000 of said monies remained.

Lori also received a $20,000 inheritance after her mother passed, which was spent on remodeling the kitchen in the parties' marital home and paid for a cruise for the parties. Lori also received an annuity of approximately $19,500, which still existed at the time of trial.

In March 2015, after thirty-three years of marriage, Lori filed a petition for dissolution of marriage. At the time Lori filed, both parties were in their mid-fifties, and their children were of majority.

At trial, the parties disputed, in relevant part, the valuation of Leo's Italian Restaurant and the marital home, the status of the debt secured by the marital home, and the treatment of the gifts received from Michael's aunt and uncle. In March 2016, following trial, the district court entered its decree of dissolution. The district court adopted the valuation of Leo's Italian Restaurant provided by Lori's expert, adopted Michael's valuation of the marital home, and found it would be inequitable not to include a substantial portion of the gifts and inheritances in the division of the assets. In the decree, the district court awarded Lori $347,073 in assets and $2689 in debt, Michael $890,219 in assets and $6300 in debt, and Lori a $200,000 equalization payment. Michael appeals.

**II.     Standard and Scope of Review.**

We review cases tried in equity, such as dissolution cases, de novo.  Iowa R. App. P. 6.907; *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015).  We give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them.  Iowa R. App. P. 6.904(3)(g).  Prior cases, though helpful, have little precedential value because we must base our decision primarily on the particular circumstances of the parties presently before us.  *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983).  We accord the trial court considerable latitude in making factual determinations and will disturb the ruling only when there has been a failure to do equity.  *Gust*, 858 N.W.2d at 406.

**III.    Analysis**

Michael challenges two aspects of the district court's decree: (1) the distribution of gifts and inheritances and (2) the overall distribution of the parties' property.  Michael also requests appellate attorney fees.

**A.     Gifts and Inheritances**

In his appeal, Michael requests we increase the amount of gifts and inheritance set apart to him by eliminating the $200,000 equalization payment ordered by the district court.

Iowa Code section 598.21(6) (2016) provides:

> Property inherited by either party or gifts received by either party prior to or during the course of the marriage is the property of that party and is not subject to a property division . . . except upon a finding that refusal to divide the property is inequitable to the other party or to the children of the marriage.

In finding that the gifts should be divided, the district court reasoned:

> The evidence clearly establishes that Lori consistently made critical contributions to the support of the family from the very beginning to the present, by providing income and medical insurance, even when Mi[chael]'s business ventures were unsuccessful in the early years, while she worked full-time and the children were born. In later years, she continued to work full-time and assist the family business, by both her efforts there and in community affairs. Nearly all of the gifts and inheritances received by both parties were used and commingled in the acquisition and support of jointly owned family assets. The value of these assets appreciated in value after receipt of the gifts and inheritances. Both the stock and marital home are jointly owned.
>
> Lori's contributions to the marriage, both from her own earnings, her work in the business, and her community activities which also contributed [to] the viability of the business in the community, and the use of marital funds from refinancing the homestead to assist the corporation when needed, both justify an award to her based on the value of the stock.
>
> The court concludes that it would be inequitable to Lori to fail to consider and include a substantial portion of gifted and inherited assets in the division of the assets remaining from this marriage.

On our review of the district court's award, we consider (1) the contributions each party made "toward the property, its care, preservation or improvement," (2) whether there existed "any independent close relationship" between Lori and Michael's aunt and uncle, (3) "separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them," (4) the existence of any special needs for either Lori or Michael, and (5) whether it would be plainly unfair to Lori or the parties' children to have the property set aside for Michael. *In re Marriage of Thomas*, 319 N.W.2d 209, 211 (Iowa 1982).[3]

---

[3] We assume, as the district court implicitly found, the gifts were made to Michael.

As noted by the district court, the length of the marriage is an important factor; here, the parties were married for thirty-three years and raised two children together. *See In re Marriage of Hardy*, 539 N.W.2d 729, 731 (Iowa Ct. App. 1995) ("The length of the marriage is also an important factor in considering when gifted or inherited property should be divided."). During that time, Lori consistently provided financial security for the family. Because of this contribution, Michael was able to pursue his various business endeavors, pursuits in which Lori actively provided support. While making this contribution, Lori was also involved in providing care for Michael's aunt and uncle.

Further, while not a controlling factor, we note the gifts and inheritance—beyond the annuity awarded to Lori and the approximate $42,000 of inheritance awarded to Michael—were comingled with marital assets. *See In re Marriage of Fall*, 593 N.W.2d 164, 167 (Iowa Ct. App. 1999). Specifically, adopting the facts provided by Michael, the gifts from Michael's aunt and uncle were received between 2000 and 2003—over a decade before the marriage dissolved—and were used in large part to fund their businesses and cover the expense of their home. *See In re Marriage of Soloski*, No. 05-0310, 2006 WL 623583, at *5 (Iowa Ct. App. Mar. 15, 2006) (finding it inequitable to set aside a $219,095 gift that had been used for a down payment on the family home and invested in a real estate partnership owned by the husband when the nearly thirty-year marriage dissolved). These were assets to which Lori also contributed financially and with her own time and efforts. This long-term marriage was a partnership that benefited economically from the contributions of each partner. Moreover, these parties have received gifts from their respective families throughout the duration

of their marriage, starting with the loans given and ultimately forgiven when the parties lived in Texas.  We conclude, for the above reasons, the district court did not fail to do equity by refusing to further set aside to Michael the gifts and inheritances he received.

## B.  Property Distribution

Michael also claims the total property distribution was inequitable.  The parties in a dissolution action "are entitled to a just and equitable share of the property accumulated through their joint efforts."  *In re Marriage of O'Rourke*, 547 N.W.2d 864, 865 (Iowa Ct. App. 1996).  Iowa law does not require an equal division, but rather "what is fair and equitable in each circumstance."  *In re Marriage of Campbell*, 623 N.W.2d 585, 586 (Iowa Ct. App. 2001).

At trial, the district court valued the property it awarded to Lori at $347,073.  Michael received a property award valued by the court at $896,519.  Lori was ordered responsible for a furniture loan of $2689, and Michael was ordered responsible for a loan of $6300 and for the mortgage on the parties' home.  In addition to this distribution of the parties' debts and assets, the district court ordered Michael to pay Lori a $200,000 equalization payment.  Michael requests that this court eliminate that equalization payment.

The parties dispute the value of two of the properties at issue, both of which were awarded to Michael.  First, they dispute the value of the marital home.  Michael appraised the home at $327,000; Lori valued the home at $420,000.  The district court noted that, for real estate tax purposes, the home was valued at $354,300.  Ultimately, the district court adopted Michael's appraisal at $327,000.

The parties next dispute the valuation of Leo's Italian Restaurant. The district court adopted the valuation provided by Lori's expert of $267,718. On appeal, Michael contests Lori's expert's method of valuing the restaurant, identifying certain alleged errors in the calculation; however, in his brief, Michael proffers no other valuation in the alternative. We find the valuation is within the range of permissible evidence and will not disturb it.[4] *See In re Marriage of McDermott*, 827 N.W.2d 671, 679 (Iowa 2013).

Next, Michael disputes the district court's alleged failure to account for the debt attached to Leo's Italian Restaurant, which was secured by a mortgage on the parties' home. While the court did not assign a value to that encumbrance, Lori's expert claimed his valuation of Leo's Italian Restaurant accounted for payments being made on that debt; thus, it was addressed by the district court's award.

Finally, Michael notes the assets he was awarded are not liquid, argues the district court overestimated his income, and concludes he is in no financial position to make the ordered equalization payment. After awarding the parties their respective portions of the assets and debts—which, as valued by the district court, left Lori with $344,384 in assets and Michael with $890,219—the district court awarded Lori a $200,000 equalization payment—leaving Lori and Michael with $544,384 and $690,219, respectively. We find the award of the district court was equitable and affirm.

---

[4] Michael also notes Lori's expert filed an updated valuation that listed the property at $257,757, a difference of approximately $10,000. Even if we were to adjust the valuation of the restaurant based on this update, it does not impact the equitability of the distribution made by the district court.

### C.    Attorney Fees

Michael requests an award of his appellate attorney fees.  "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion."  *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).  "[I]n determining whether to award attorney fees," we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (citation omitted).  Having considered these factors, we decline Michael's request for attorney fees on appeal.

**AFFIRMED.**

Tabor, Presiding Judge, concurs; Goodhue, Senior Judge, dissents.

**GOODHUE, Senior Judge** (dissenting)

I respectfully dissent. Like the district court, the majority accepted the appraisal of Lori's expert, Shannon Shaw, in valuing the restaurant business owned by the parties and determining the total value of the marital assets of the parties and the value of the assets awarded to Michael. Our objective is to determine the fair market value of the marital assets, which is defined as the price that would be agreed upon by a willing buyer and a willing seller. *See In re Marriage of Hartung*, No. 14-1300, 2015 WL 4642480, at *3 (Iowa Ct. App. Aug. 5, 2015) (citing *Maytag Co. v. Partridge*, 210 N.W.2d 584, 587 (Iowa 1973)). Shaw's appraisal, which has been accepted in total, involved multiple assumptions. Shaw did not purport to have appraised the restaurant business on the basis of what a willing buying and a willing seller would arrive at. He testified instead that his intent was to appraise the restaurant from the point of view of the seller and on the basis the seller would want the highest indicated value.

One of the assumptions made was that the incorporated business—which was operated as a restaurant—owned an asset with Cetera Financial Group with a value of $56,336. Shaw added this amount at its face value to the appraised value of the business, which he determined to be $201,421. The parties each had Roth IRA accounts with Cetera, which were reflected in the total of the marital assets and in the assets awarded to each of the parties. In addition, they had a joint account with Cetera that was included in the decree. Statements showing the valuation of the Cetera accounts were among the exhibits admitted into evidence, which included a statement that the listing of the accounts included the household total of the assets of the parties held by Cetera. There is

no statement showing a Cetera account in the corporate name and no statement of an account in the amount of $56,366. I have not found in my search of the extensive record that anyone other than Shaw made mention of such an account. Shaw assumes such an account by reason of an unaudited balance sheet of the corporation that reflected an asset that at the time of trial showed a value of $56,336. It had also been reported in the previous balance sheets and reflected an increase of $3600 per year.

Accompanying the statements of a Cetera valuation was a handwritten document, submitted as an exhibit by Lori, showing the total deposits made to the Roth IRAs since the accounts were transferred to PrimaVest, now known as Cetera Investment Services. The handwritten document shows deposits of $1800 in 2008 and a like sum deposited in each of the subsequent years, including 2015.

Michael filed a motion to modify the dissolution decree. Michael noted that the $56,336 that Shaw called Cetera life insurance and added on to the value of the restaurant business in effect did not exist. Shaw had picked up the Cetera account from the corporate balance sheet, but the account in question represented payments made by the corporation to Cetera for the two Roth IRAs of the parties. One is owned by Michael, one is owned by Lori, and they were listed as separate assets of the parties and distributed accordingly. Unfortunately, the motion was not discovered by the trial court until after the matter had been appealed and the trial court no longer had jurisdiction. The trial court suggested a limited remand so that the matter could be considered, but I do

not find that any such request was made. Michael made the same argument in his brief on appeal.

I believe Michael's explanation of the allegedly corporate-owned asset is consistent with the record. The evidence does not support the existence of an account or paid-up life insurance policy owned by the corporation. It appears that the sum was paid by the corporation into Roth accounts, which are not tax deductible, and the amounts paid were simply carried as an asset account of the corporation in order to make the expense and asset accounts of the corporation balance with the cash account. No other evidence in the record indicates the corporation had a paid-up life insurance policy or any other account with Cetera, but it reflects $1800 per year was being paid out on each party's Roth IRA and carried as an asset account.

The majority noted that the trial court valued the restaurant business for $10,000 more than the Shaw valuation but noted the valuation was within the permissible range of the evidence. I would concur if the difference was only $10,000, but with the deletion of Shaw's assumed asset of $56,336, I believe an adjustment of that amount—at a minimum—should be made. Michael's share of the marital assets has been decreased by $66,336, and I would hold that the equalization payment should accordingly be adjusted.